IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JOHNNY CONNER NICHOLS, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Case No. 5:11-cv-116 (MTT) |
| | : | |
| DR. EDWARD HALE BURNSIDE, | : | Proceedings Under 42 U.S.C. § 1983 |
|     Defendant. | : | Before the U.S. Magistrate Judge |
| _____ | : | |

## RECOMMENDATION

Before the Court is Defendant Dr. Edward Hale Burnside's Motion for Summary Judgment. Doc. 59. Because Plaintiff Johnny Conner Nichols has not shown that there are genuine issues of material fact regarding Dr. Burnside's alleged deliberate indifference to Plaintiff's serious medical needs, it is hereby **RECOMMENDED** that the Motion for Summary Judgment be **GRANTED**.

PROCEDURAL HISTORY

On March 30, 2011, Plaintiff Johnny Conner Nichols filed his complaint pursuant to 42 U.S.C. § 1983, alleging that he received constitutionally inadequate medical treatment for his injured back during his incarceration at Georgia Diagnostic and Classification Prison. Doc. 1. According to the complaint, Defendants Dr. Burnside, Warden Upton, and Director of Utilization Management Abreu were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. Id. Following a frivolity review of Plaintiff's complaint under 28 U.S.C. § 1915A, the Court allowed Plaintiff to proceed with his claims against Dr. Burnside only. Docs. 7, 10.

On August 31, 2011, Dr. Burnside filed his motion to dismiss. Doc. 16. After consideration of the motion to dismiss, it was recommended that any claim against Dr. Burnside

in his official capacity should be dismissed and that any claim against Dr. Burnside in his individual capacity should proceed for further factual development. Doc. 27. The Court adopted this recommendation and made it the order of the Court on September 4, 2012. Doc. 36. On March 18, 2013, following the close of discovery, Dr. Burnside filed his motion for summary judgment. Doc. 59. Plaintiff responded on May 14, 2013. Doc. 62.

## FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the facts of this case are as follows: Plaintiff was incarcerated at Georgia Diagnostic and Classification Prison from March 11, 2010 to March 18, 2011. Doc. 59-15 at 9-10 and Doc. 59-13 at 31-32. Prior to his arrival at Georgia Diagnostic and Classification Prison, while he was incarcerated at Macon State Prison, Plaintiff complained that he was suffering from an undiagnosed lower back condition and that the medication being used to treat his back pain was inadequate. Doc. 59-6 at 9. Plaintiff also complained that he injured his upper back at Macon State Prison when he picked up two books and "felt something pop in my upper back." Id. at 11. According to Plaintiff, this new injury caused him to suffer from an undiagnosed upper back condition. Id.

After Plaintiff injured his upper back, the medical staff at Macon State Prison examined Plaintiff, gave him a Toradol injection, and prescribed other pain medication. Doc. 59-6 at 11. The medical staff at Macon State Prison also ordered x-rays of Plaintiff's c-spine, t-spine, and l-spine. Doc. 59-15 at 19. On February 3, 2010, the x-rays were read as part of a radiological consultation. Id. at 17. The x-ray of the upper back or c-spine revealed no evidence of fracture, dislocation, or abnormality. Id. The x-ray of the middle back or t-spine revealed slight scoliosis but no evidence of fracture. Id. The x-ray of the lower back or l-spine revealed spina bifida occulta but no evidence of fracture, dislocation, or disc disease. Id.

Based on the x-ray results, Dr. Bemby of Macon State Prison submitted a request to Utilization Management for an MRI of Plaintiff's upper and middle back. Doc. 59-15 at 11. Utilization Management is the separate, statewide entity responsible for reviewing requests for specialists and advanced diagnostic procedures, determining whether those requests are medically necessary, and deciding whether those requests are the best course of treatment. Doc. 59-3 at 4-5. If Utilization Management denies a request for a particular course of treatment, the medical staff cannot overrule Utilization Management's decision. Id. On March 11, 2010, Plaintiff was transferred from Macon State Prison to Georgia Diagnostic and Classification Prison. Doc. 59-15 at 9-10. At the time of his transfer, the request for an MRI made by Dr. Bemby remained pending before Utilization Management. Id. at 11.

On the day Plaintiff was transferred to Georgia Diagnostic and Classification Prison, a nurse performed his intake examination. Doc. 59-15 at 9-10. The only pain medication that had been prescribed for Plaintiff at the time of his transfer was Motrin. Id. Plaintiff continued to take Motrin for thirty days as prescribed. Doc. 59-11 at 11. That same day, Plaintiff was assigned to the Special Management Unit. Doc. 59-15 at 8. The medical staff at Georgia Diagnostic and Classification Prison regularly conducted rounds, at least three times each week, to check on all inmates in the Special Management Unit. Id. In addition to scheduled medical appointments, sick call requests, and regularly conducted rounds in the Special Management Unit, a nurse would walk through the Special Management Unit two times each day to distribute medication and observe the condition of inmates. Doc. 59-3 at 8. Inmates with complaints could discuss them with the nurse at this time. Id. Plaintiff did not report any problems to the medical staff during the six rounds conducted between March 11, 2010 and March 23, 2010. Doc. 59-15 at 8.

Dr. Burnside first examined Plaintiff on March 23, 2010. Doc. 59-15 at 7. According to the encounter form, Plaintiff complained about increased back pain and mentioned the pending request for an MRI. Id. Dr. Burnside prescribed Tylenol for thirty days as an additional pain medication and advised Plaintiff that he would review Plaintiff's condition after Utilization Management resolved the pending request for an MRI. Doc. 59-11 at 11 and Doc. 59-15 at 7. Also during this first meeting, Dr. Burnside allegedly refused to prescribe a fourteen day supply of Tylenol 3 for Plaintiff and allegedly told Plaintiff, "[t]he MRIs which have been ordered are more than you would have gotten from me." Doc. 1 at 4. The next day, on March 24, 2010, Plaintiff received a Toradol injection from a nurse after Plaintiff complained about experiencing a sharp pain from his neck to his right arm. Doc. 59-15 at 6. The nurse advised Plaintiff to take his medications as prescribed and to contact the medical staff if the pain persisted. Id. Between March 23, 2010 and April 13, 2010, Plaintiff did not report any problems to the medical staff during the regularly conducted rounds in the Special Management Unit. Id. at 5, 8.

Dr. Burnside next examined Plaintiff on April 13, 2010. Doc. 59-15 at 2. Thirteen days before Plaintiff's second meeting with Dr. Burnside, on March 31, 2010, Utilization Management denied the request for an MRI of Plaintiff's upper and middle back, stating "[p]lease treat conservatively. Re-submit consult request if symptoms persist or worsen." Id. at 11. Dr. Burnside reviewed Utilization Management's decision with Plaintiff. Id. at 2. According to the encounter form, Plaintiff stated that he wanted an MRI performed and that he wanted a prescription for Indocin, which is a pain medication similar to Motrin, for his back pain. Id. Dr. Burnside believed that it would be inappropriate to make a second request for an MRI of Plaintiff's upper and middle back without sufficient new information to support such a request. Doc. 59-3 at 9-10. Even so, Dr. Burnside prescribed Indocin for ninety days, consistent with

4

Plaintiff's request for this particular pain medication. Doc. 59-11 at 10 and Doc. 59-15 at 2. Between April 13, 2010 and May 10, 2010, Plaintiff did not report any problems to the medical staff during the regularly conducted rounds in the Special Management Unit. Doc. 59-15 at 5.

Dr. Burnside also examined Plaintiff as part of a chronic care visit on May 10, 2010. Doc. 59-14 at 28. After Plaintiff's third meeting with Dr. Burnside, Plaintiff's next appointment was scheduled to take place in six months or November 2010. Id. Based on Plaintiff's ongoing complaints of lower back pain and the evidence of spina bifida occulta in the previous x-ray of Plaintiff's lower back, Dr. Burnside requested an MRI to determine whether Plaintiff had a surgical issue with his lower back. Doc. 59-3 at 10 and Doc. 59-14 at 25. On June 21, 2010, Utilization Management approved Dr. Burnside's request for an MRI of Plaintiff's lower back. Doc. 59-14 at 26. Between May 10, 2010 and June 28, 2010, Plaintiff did not report any problems to the medical staff during the regularly conducted rounds in the Special Management Unit. Doc. 59-15 at 5 and Doc. 59-14 at 22.

The findings of the MRI, which was performed at Augusta State Medical Prison on June 28, 2010, were as follows: "[t]he lumbar vertebral bodies are normal in stature without evidence of fracture. There is Grade I anterolisthesis of L5 in relation to S1 with bilateral pars defect at L5. The spinal cord has normal signal intensity and is seen to normally terminate at T12-L1. The disk spaces are well-maintained without evidence of significant disk bulge or herniation. There is mild facet arthropathy at L4-L5. The paravertebral soft tissues are unremarkable." Doc. 59-14 at 24. Dr. Burnside summarized the results of the MRI as unremarkable with no indication of any surgical issues. Doc. 59-3 at 10 and Doc. 59-12 at 14.

On June 29, 2010, Plaintiff completed a health services request form, alleging that the MRI erroneously was performed on his lower back as opposed to his upper back and requesting

5

that Dr. Burnside correct this error by ordering an MRI of Plaintiff's upper back. Doc. 59-4 at 2. According to the health services request form, Plaintiff only wished to been seen by the medical staff if necessary, and Plaintiff did not request the refill of any prescriptions. Id. Dr. Burnside responded to Plaintiff's request on July 6, 2010, stating that the MRI of Plaintiff's lower back was normal and that no additional MRIs were indicated. Id. Between June 29, 2010 and August 8, 2010, Plaintiff did not report any problems to the medical staff during the regularly conducted rounds in the Special Management Unit. Doc. 59-14 at 22.

Plaintiff states that he submitted health services request forms about ordering an MRI of his lower back and refilling his pain medication on July 15, 2010, July 23, 2010, and July 30, 2010, but none of his requests were answered.[1] Doc. 1 at 9. On August 8, 2010, Plaintiff filed another health services request form on which he wrote "5th Request" in the margins. Doc. 1-1 at 8. Plaintiff requested to be seen by the medical staff because his "back pain is intensifying without meds, which you have not re-ordered! Need re-order on MRIs upper back." Id. Plaintiff also requested a thyroid test and refills of three prescriptions for cholesterol and blood pressure medications and one prescription for the pain medication Indomethacin, which is the generic name for Indocin. Id. Dr. Burnside responded to Plaintiff's request on August 10, 2010, stating that no additional MRIs were indicated. Id.

Between August 8, 2010 and October 26, 2010, Plaintiff did not report any problems to the medical staff during the regularly conducted rounds in the Special Management Unit. Doc. 59-14 at 20, 22. Plaintiff claims that he submitted additional health services request forms about ordering an MRI of his lower back and refilling his pain medication on August 16, 2010, September 4, 2010, September 15, 2010, and September 22, 2010, but none of his requests were

---

[1] Although Plaintiff supplied the Court with a voluminous amount of documents concerning his medical care, Plaintiff failed to attach copies of these three health services request forms to either his complaint or his response in opposition to the motion for summary judgment.

6

answered.[2] Doc. 1 at 9. Plaintiff received a thirty day supply of his three cholesterol and blood pressure medications from a nurse on August 19, 2010. Doc 62-4 at 7. On September 9, 2010, Plaintiff filed another health services request form in which he requested to be seen by the medical staff because "my blood pressure prescription has expired, and I need another refill by the 16th. I also need to see the Dr. about the results of the MRI on my lower back!" Doc. 59-5 at 2. Plaintiff also requested a thyroid test and refills of three prescriptions for cholesterol and blood pressure medications. Id. Plaintiff did not request a refill of any pain medication. Id. Dr. Burnside responded to Plaintiff's request on September 14, 2010, stating that "MRI is ok." Id.

On September 14, 2010, Dr. Burnside authorized refills of Plaintiff's three cholesterol and blood pressure medications for one hundred and eighty days. Doc. 59-11 at 10. The next day, Plaintiff received another thirty day supply of these medications from a nurse. Doc 62-4 at 7. On October 5, 2010, Plaintiff was examined by a nurse after he complained about experiencing ongoing back pain related to his scoliosis. Doc. 59-12 at 14. Plaintiff also asked the nurse for a refill of Indocin. Id. Based on Plaintiff's complaints, the nurse requested, and Dr. Burnside authorized, a refill of Plaintiff's prescription for Indocin for one hundred and eighty days on October 6, 2010. Doc. 59-11 at 9. On October 7, 2010, Plaintiff received a thirty day supply of Indocin from a nurse. Doc 62-4 at 8. Plaintiff received another thirty day supply of Indocin on November 10, 2010. Id. According to Dr. Burnside, he never deliberately refused to prescribe any medication to Plaintiff. Doc. 59-3 at 14.

As previously scheduled, Dr. Burnside examined Plaintiff on November 16, 2010. Doc. 59-14 at 11. Plaintiff's primary complaint involved swelling in his leg. Id. Dr. Burnside did not observe any basis for swelling, and he noted that the examination was unremarkable. Doc. 59-14

---

[2] Plaintiff also failed to attach copies of these four health services request forms to either his complaint or his response in opposition to the motion for summary judgment.

at 11 and Doc. 59-3 at 12. Dr. Burnside next examined Plaintiff on December 14, 2010. Doc. 59-14 at 6. Based on Plaintiff's complaint about numbness and pain in his right arm, Dr. Burnside requested an EMG to evaluate whether there was a nerve blockage in Plaintiff's upper extremities. Id. at 7. Dr. Burnside examined Plaintiff for the sixth and final time on January 25, 2011. Id. at 3. During this meeting, Plaintiff complained of potential skin cancer and made no mention of any back pain. Id. When Plaintiff transferred from Georgia Diagnostic and Classification Prison on March 18, 2011, he took sixty-six caplets of Indocin with him. Doc. 59-13 at 32. Later, fifteen caplets of Indocin were found in the custody of the inmate in the cell next to where Plaintiff was housed in a packet with Plaintiff's name on it. Doc. 59-3 at 13.

## LEGAL STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to judgment as a matter of law. Id. at 324-326. If the evidence presented by the non-movant is "not

significantly probative" or is "merely colorable," then summary judgment must be granted. Anderson, 477 U.S. at 249. In fact, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## DISCUSSION

Plaintiff alleges that Dr. Burnside was deliberately indifferent to serious medical needs by inadequately treating Plaintiff's back pain during his incarceration at Georgia Diagnostic and Classification Prison. More specifically, Plaintiff alleges that Dr. Burnside demonstrated deliberate indifference by ordering an MRI on the wrong part of Plaintiff's back and by refusing to refill Plaintiff's prescription for Indocin. Plaintiff, however, fails to show that any genuine issue of material fact remains regarding the adequacy of his medical treatment. Because the medical staff at Georgia Diagnostic and Classification Prison regularly met with and cared for Plaintiff, and because Plaintiff has not shown that Dr. Burnside was deliberately indifferent to his serious medical needs, Dr. Burnside is entitled to judgment as a matter of law.

To create genuine issues of material fact, Plaintiff must point to specific evidence that Dr. Burnside was deliberately indifferent to Plaintiff's serious medical needs. In order to establish deliberate indifference, a prisoner must satisfy both an objective and a subjective component. Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999). Regarding the objective component, a prisoner must allege both an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and also that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). With respect to the subjective component, a prisoner must allege, and ultimately prove, three facts: (1) subjective knowledge of a risk of serious harm; (2)

9

disregard of that risk; and, (3) by conduct that is more than mere negligence. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Additionally, as with any tort claim, a prisoner must show that an injury was caused by the prison official's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

It is not enough to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The elements required to prove the subjective component of a deliberate indifference claim establish that "mere accidental inadequacy, negligence in diagnosis or treatment, [or] even medical malpractice" is not actionable under 42 U.S.C. § 1983. Taylor, 221 F.3d at 1258. A prisoner cannot establish a violation simply because he "may have desired different modes of treatment" than that which was provided to him. Hamm v. DeKalb County, 774 F.2d 1567, 1576 (11th Cir. 1985). Such course of treatment claims, by definition, involve the "exercise of professional judgment" and as such are not actionable. Estelle v. Gamble, 429 U.S. 97, 105 (1976).

Preliminarily, the record demonstrates that the medical staff, including Dr. Burnside, regularly met with and cared for Plaintiff during his incarceration at Georgia Diagnostic and Classification Prison. According to Plaintiff's medical records, not only did the medical staff examine or treat Plaintiff on eleven separate occasions between March 11, 2010 and March 18, 2011, but the medical staff also regularly conducted rounds, at least three times each week, in the Special Management Unit where Plaintiff was housed. Plaintiff's medical records also establish that Dr. Burnside personally examined and treated Plaintiff on the following six occasions: March 23, 2010, April 13, 2010, May 10, 2010, November 16, 2010, December 14, 2010, and January 25, 2011. As part of his ongoing treatment of Plaintiff, Dr. Burnside requested an MRI of Plaintiff's lower back and an EMG of Plaintiff's upper extremities. Dr. Burnside also

examined Plaintiff for a variety of complaints, including ongoing back pain, numbness in his arm, swelling in his leg, and skin cancer. In addition to scheduled medical appointments, sick call requests, and the regularly conducted rounds in the Special Management Unit, Plaintiff also had an opportunity to talk to the nurse who would walk through the Special Management Unit two times each day to distribute medication and observe the condition of inmates.

Plaintiff's argument that Dr. Burnside was deliberately indifferent for ordering an MRI on the wrong part of Plaintiff's back misunderstands the record. This case involves two separate requests for an MRI. On March 2, 2010, Dr. Bemby of Macon State Prison requested an MRI of Plaintiff's upper and middle back. Utilization Management denied Dr. Bemby's request. Dr. Burnside had no involvement in either the initial request for an MRI of Plaintiff's upper and middle back or the subsequent denial of that request. After reviewing the decision of Utilization Management, Dr. Burnside did not believe that there was a sufficient basis to submit another request for an MRI of Plaintiff's upper and middle back because the prior x-ray of Plaintiff's upper back was normal, and because Utilization Management had denied the request for an MRI of Plaintiff's upper and middle back less than one month before. On May 11, 2010, Dr. Burnside requested an MRI of Plaintiff's lower back to evaluate whether there was a surgical issue. Even though Dr. Burnside examined Plaintiff and observed no acute subjective findings to support Plaintiff's allegations, Dr. Burnside determined that the request for an MRI of Plaintiff's lower back was medically necessary based on Plaintiff's ongoing complaints of lower back pain and the evidence of spina bifida occulta in the prior x-ray of Plaintiff's lower back. Utilization Management approved the request for an MRI of Plaintiff's lower back, and the MRI of Plaintiff's lower back was performed on June 28, 2010. As such, the record demonstrates that the

MRI of Plaintiff's lower back was performed on the correct part of Plaintiff's back as requested by Dr. Burnside and approved by Utilization Management.

Plaintiff's argument that Dr. Burnside was deliberately indifferent for ordering an MRI on the wrong part of Plaintiff's back also misunderstands the applicable law. There is no evidence that Dr. Burnside was deliberately indifferent to Plaintiff's serious medical needs by failing to submit another request for an MRI of Plaintiff's upper and middle back. Plaintiff alleges that he experienced both upper and lower back pain and that Dr. Burnside should have treated his back pain doing something more than what he did, such as, by submitting another request for an MRI of Plaintiff's upper and middle back. Where, as here, Plaintiff's primary allegation is that something more should have been done to treat his undiagnosed back injury, it is well-established that a doctor's medical decision not to order an MRI or similar diagnostic measure does not rise to the level of deliberate indifference. Campbell, 169 F.3d at 1163, quoting Estelle, 429 U.S. at 107. Insofar as Plaintiff believes that a different course of treatment would have been preferable or that more extensive diagnostic measures should have been pursued to treat his back pain, such a course of treatment claim, which necessarily involves the exercise of Dr. Burnside's professional judgment, is not actionable as a claim for deliberate indifference. See Estelle, 429 U.S. at 105.

Plaintiff's argument that Dr. Burnside was deliberately indifferent for refusing to refill Plaintiff's prescription for the pain medication Indocin is unpersuasive as well. The record here indicates that Plaintiff's prescription for Indocin lapsed on July 13, 2010 and that the prescription was refilled on October 6, 2010. The record further indicates that Dr. Burnside authorized the refill of Indocin one day after Plaintiff was examined by a nurse concerning his complaints of back pain, at which time Plaintiff specifically asked the nurse to refill his prescription of Indocin.

The only evidence tending to show that Dr. Burnside either knew or should have known that Plaintiff's prescription for Indocin had lapsed is the health services request form that Plaintiff completed on August 8, 2010. On the health services request form, Plaintiff asked to meet with the medical staff because of his increased back pain and the need to reorder an MRI of his upper back. Plaintiff also requested a thyroid test and refills of three prescriptions for cholesterol and blood pressure medications and one prescription for the pain medication Indomethacin, which is the generic name for Indocin. Dr. Burnside responded to Plaintiff's health service request form on August 10, 2010, stating that no additional MRIs were indicated.

Although the record indicates some delay between the date Plaintiff's prescription for Indocin lapsed and the date it was refilled, there is no basis to conclude that this delay is attributable to Dr. Burnside's deliberate indifference. Assuming for the sake of argument that Plaintiff's back pain amounted to an objectively serious medical need, Plaintiff wholly fails to offer evidence tending to show that: (1) Dr. Burnside had subjective knowledge of a risk of serious harm; (2) Dr. Burnside disregarded that risk; and (3) Dr. Burnside's conduct amounted to more than mere negligence. See McElligott, 182 F.3d at 1255. Dr. Burnside expressly avers that he never deliberately refused to prescribe any medication to Plaintiff. By contrast, Plaintiff does not identify any specific evidence that Dr. Burnside ordered, condoned, or willfully refused to refill Plaintiff's prescription for Indocin in order to punish Plaintiff. See Taylor, 221 F.3d at 1257. At most, the delay involved here suggests that Dr. Burnside overlooked one of the several items included on the health services request form that Plaintiff filed on August 8, 2010. At most, such an oversight would amount to mere negligence rather than deliberate indifference. Id. at 1257-1258. Further, Plaintiff does not offer any evidence tending to show that he suffered any lasting physical injury as a result of the delay. See Hill v. Dekalb Regional Youth Detention

Center, 40 F.3d 1176, 1186 (11th Cir. 1994), abrogated on other grounds, Hope v. Pelzer, 536 U.S. 730 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

In sum, even after viewing the evidence in the record and all reasonable inferences in the light most favorable to Plaintiff, there is no specific evidence tending to show that Dr. Burnside was deliberately indifferent to Plaintiff's serious medical needs. As a result, Dr. Burnside is entitled to judgment as a matter of law.

## CONCLUSION

Because Plaintiff has not shown that there are genuine issues of material fact regarding Dr. Burnside's alleged deliberate indifference to his serious medical needs, it is hereby **RECOMMENDED** that the Motion for Summary Judgment (Doc. 59) be **GRANTED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation with the District Judge to whom the case is assigned **within fourteen (14) days** after being served with a copy thereof.

**SO RECOMMENDED**, this 17th day of December, 2013.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge
